**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-23-01293-PHX-GMS |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| (1) Alexis Daneen Curry; and (2) Thvoughn Lynden Curry, | |
| Defendants. | |

Pursuant to Federal Rule of Criminal Procedure 23(c), the Court hereby makes its findings of fact and its conclusions of law in the above-captioned case.

## FINDINGS OF FACT

1. The Court held a four-day bench trial in the above-captioned matter, beginning on February 3, 2026, and concluding on February 10, 2026.

2. The Government has established the identity of the first-listed Defendant as being Alexis Daneen Curry.

3. The Government has established the identity of the second-listed Defendant as being Thvoughn Lynden Curry.

4. The grand jury returned a superseding 26 count indictment on August 6, 2024 (Doc. 54), charging Defendants each with:

    (a) One count of Conspiracy (Count 1), in violation of 18 U.S.C. § 1349, for conspiring to commit Wire Fraud (18 U.S.C. § 1343) and Health Care Fraud (18 U.S.C. § 1347);

    (b) One count of Wire Fraud (Count 2), in violation of 18 U.S.C. §§ 1343 and 2;

    (c) Twelve counts of Health Care Fraud (Counts 3-14), in violation of 18 U.S.C. §§ 1347 and 2; and

    (d) Twelve counts of Transactional Money Laundering (Counts 15-26), in violation of 18 U.S.C. §§ 1957 and 2.

5. At the outset of the first day of trial, the Government moved to dismiss Counts 3-5, 7, 9, 11-15, 18-19, and 21.  The Court did so without prejudice.

**A.  <u>The Arizona Health Care Cost Containment System ("AHCCCS")</u>**

    i.  *Background*

6. The Arizona Health Care Cost Containment System ("AHCCCS") is Arizona's Medicaid agency that provides healthcare services for low-income individuals. AHCCCS is primarily funded by the federal government but also receives funding from the State of Arizona.  The agency offers a range of services spanning medical, vision, hearing, and behavioral health.

7. Individuals registered with AHCCCS are typically referred to as "members."  Members qualify for AHCCCS services based on their income level.

8. Behavioral health services under AHCCCS are available to those with either a mental health diagnosis or substance abuse diagnosis.

9. Behavioral health services covered under AHCCCS are generally provided at three different types of facilities:

    (a) The first, outpatient treatment facilities, involve the lowest level of care where services are generally provided only for a few hours at a time.

    (b) The second, behavioral health residential facilities ("BHRFs"), are 24-hour living facilities for individuals who need constant supervision and cannot live independently.  At a BHRF, members live in the residence (also referred to as a "house").  BHRFs are managed by AHCCCS-approved providers.  The providers receive a per diem of ~$300 a day for each member, reimbursed by AHCCCS, to provide the members at the house with housing, oversight, and behavioral health services.

    (c) The third, inpatient treatment facilities (such as a detox facility, subacute facility, or inpatient hospital), provide the highest level of care where a patient is admitted overnight.

10. To receive reimbursement from AHCCCS for providing outpatient services, a provider must first be licensed with the Arizona Department of Health Services ("AZDHS") to provide such services. The outpatient services provider must also have a National Provider Identification Number ("NPI")—a unique identification number for healthcare providers issued by the federal Centers for Medicare and Medicaid Services ("CMS").

11. To register with AHCCCS, providers submit an application package with information regarding (but not limited to): (i) the type of services provided; (ii) primary practice facility location; (iii) the owners, operators, and managing employees (along with dates of birth and social security numbers); (iv) hours of operation; (v) AZDHS licensure; (vi) a W-9 form containing their Employer Identification Number (EIN); (vii) NPI; and (viii) background information regarding any "adverse actions" (negative legal action, such as felony convictions, pending indictments, etc.) taken against the provider's owners, agents, managing employees, and key personnel.

12. AHCCCS vets the providers' individual owners to protect the safety and well-being of its members. AHCCCS may deny or delay an application if information—such as a prior criminal history—comes to light during the vetting process.

13. Moreover, when a provider represents to AHCCCS that it will provide services for a set number of hours, the provider is expected to only bill within that range of hours. If a provider changes its hours of operation, it must inform AHCCCS of the change.

ii. *Fee-for-Service ("FFS") Billing*

14. AHCCCS providers generally have two ways of receiving payment for services rendered to members:

(a) First, providers can receive payment from managed care organization ("MCO") health plans (such as Blue Cross Blue Shield, Aetna, etc.). The majority of AHCCCS members are covered by an MCO plan.

(b) Second, providers can also receive payment directly from AHCCCS when treating fee-for-service ("FFS") program members. Under the American Indian Health Program ("AIHP")—a subprogram of AHCCCS which covers members that are Native American or Alaskan Native— providers are directly paid for services rendered upon billing.

- 3 -

15. Providers who treat FFS members submit their claims for payment through a billing portal on the AHCCCS website.  When submitting claims, providers submit the range of dates that the services were rendered, codes reflecting the type and setting of the service provided ("CPT codes"), and the total amount of reimbursement sought, among other items.  (*See, e.g.*, Pl.'s Ex. 2).

16. Claims submitted on the AHCCCS billing portal are sent to CMS and travel through the AHCCCS "mainframe server."  Prior to 2017, the AHCCCS mainframe was located in Phoenix, Arizona.  As of February 6, 2026, the mainframe is located in Boulder, Colorado.  No testimony was offered describing where the mainframe was located between 2017 to February 2026.

17. Certain services are billed in 15-minute increments, called "units."  For example, if a provider billed a certain service for 4 units, that means that a patient was treated for 1 hour of a particular service, indicated via Current Procedural Terminology ("CPT") code.  These CPT codes include, as relevant here (Pl.'s Ex. 2, "OVERVIEW" tab):

| CPT Code | Description of Service Rendered |
|----------|--------------------------------|
| H0004 | Behavioral health counseling and therapy |
| H2014 | Skills training and development |
| H2027 | Psychoeducational service |
| T1016 | Case management (administrative add-on function to provide services separate from therapy) |

18. The CPT codes beginning with an "H" are considered "face-to-face" codes—meaning that services were provided while the member was with the provider.  T1016, on the other hand, need not occur face-to-face; instead, case management can occur simultaneously with face-to-face service (i.e., a member can receive service by a medical professional for an hour, during which a case manager can independently work on that member's case management).

19. Providers indicate "modifiers" for certain services.  Two of these modifiers, as relevant here, are:

(a) "HQ":  a group service (two or more individuals) is being provided. Failure to include this modifier indicates that the patient was treated individually.  This modifier is commonly seen with CPT code H0004 (behavioral health counseling and therapy).

(b) "HN":  the service provided is by an individual with a bachelor's degree. This modifier is commonly seen with T1016 (case management).

20. Providers also indicate the place of service ("POS").  As relevant here:

(a) "11":  the service was provided in an office.

(b) "12":  the service was provided in a home.

21. Providers indicate their provider type ("PT") as well.  As relevant here, "77" refers to outpatient services.

22. Taking the four items together—CPT code, modifiers, POS, and PT—AHCCCS sets the appropriate FFS fee schedule for any given number of units billed.  For example, an outpatient service provider that provides 120 units (30 hours) of H0004(HQ)(11) services (behavioral health counseling, in a group setting, in an office) to one member could bill and receive payment of $1,312.80 in February 2021.  (*See, e.g.*, Pl.'s Ex. 2).

**B. 1 Family Clinic, LLC ("1FC")**

   i.  *1FC's Formation and Bank Accounts*

23. On July 13, 2020, Articles of Organization for a limited liability company, 1 Family Clinic, LLC ("1FC"), were submitted with the Arizona Corporation Commission. Defendant Thvoughn Curry was listed as 1FC's statutory agent, principal, organizer, and authorized agent.  The "character of business" of 1FC was listed as "Health Care and Social Assistance."  (Pl.'s Ex. 21).

24. On October 6, 2020, Articles of Amendment for 1FC were submitted with the Arizona Corporation Commission.  The amendment added Defendant Alexis Curry as a manager for 1FC.  The amendment was signed by Alexis Curry.  (Pl.'s Ex. 22).

25. Defendants together opened four bank accounts, each with the name "1 FAMILY CLINIC LLC," with Bank of America ("BofA"):

(a) On November 24, 2020, Defendants opened a business checking account ending in 7401 ("BofA x7401").  The signature card, signed by both

- 5 -

Defendants, reflected that 1FC is a partnership, had an EIN ending in 8563, with Thvoughn Curry and Alexis Curry listed as the managers. (Pl.'s Ex. 74; Pl.'s Ex. 70; Pl.'s Ex. 78).

(b) On October 21, 2020, Defendants opened a business savings account ending in 8149 ("BofA x8149").  The signature card, signed by both Defendants, reflected that 1FC is a partnership, had an EIN ending in 8563, with Thvoughn Curry and Alexis Curry listed as the managers. (Pl.'s Ex. 74; Pl.'s Ex. 71; Pl.'s Ex. 79).

(c) On October 21, 2020, Defendants opened a business checking account ending in 8136 ("BofA x8136").  The signature card, signed by both Defendants, reflected that 1FC is a partnership, had an EIN ending in 8563, with Thvoughn Curry and Alexis Curry listed as the managers. (Pl.'s Ex. 74; Pl.'s Ex. 72; Pl.'s Ex. 80).

(d) On November 2, 2021, Defendants opened a business checking account ending in 6094 ("BofA x6094").  (Pl.'s Ex. 74; Pl.'s Ex. 81).

### ii.    *1FC's AHCCCS Application*

26. On November 25, 2020, Alexis Curry, on behalf of 1FC, submitted an application packet with AHCCCS to enroll as an AHCCCS provider.

27. 1FC's AHCCCS application made several representations (Pl.'s Ex. 1 at 5-14[1]):

(a) It listed 1FC's NPI as 1023626090;

(b) It indicated that 1FC was registering as a facility/agency organization that would provide behavioral health services at an outpatient clinic;

(c) It listed the primary practice location as 1550 E McKellips Road, Suite 110, Mesa, Arizona 85203, and did not list any other practice locations;

(d) It stated that the primary practice location's hours would be from 8:00 a.m. to 4:00 pm from Monday to Friday; 9:00 a.m. to 2:00 p.m. on Saturday; and closed on Sunday (totaling 45 hours a week);

(e) It indicated that 1FC was licensed by AZDHS, as of November 19, 2020, to provide outpatient services (license number: OTC10508);

(f) It stated that Alexis Curry had a 100% ownership interest in and was the only managing employee of 1FC, and it listed her email address as 1familyclinic@gmail.com; and

(g) It represented that for all individuals and entities with an ownership or

---

[1]    Exhibit pincites refer to the bates number of the exhibit, found at the lower right corner of the page.  For example, the pincite to "CURRY_000012"—found in Plaintiff's Exhibit 1—would be (Pl.'s Ex. 1 at 12).

control interest in 1FC, and for all agents, managing employees, and key personnel of 1FC, that there were *no* convictions or any pending proceedings (such as an indictment, pending plea, or investigation) that could result in any sanction, conviction, or action taken against the individual or entity.

28. The application packet appended a W-9 Form, which is a Request for Taxpayer Identification Number and Certification.  In the W-9, signed by Alexis Curry, the Employee Identification Number ("EIN") for 1FC ended in 8563.  (Pl.'s Ex. 1 at 42).  This EIN was listed on the bottom of each page of the application packet.  (*Id.* at 2-40).

29. The application packet also appended a copy of the certification and transmittal form received from AZDHS.  The form identified that 1FC was only licensed to provide outpatient treatment center/counseling services.  (Pl.'s Ex. 1 at 45).

30. The application packet contained a Provider Participation Agreement ("PPA"), which is a contract between the provider and AHCCCS.  (Pl.'s Ex. 1 at 16-20).  The PPA lays out the various policies, procedures, and guidelines that a provider must follow to become an AHCCCS provider with the Medicaid system.  The PPA incorporates by reference all AHCCCS guidelines, policies, and manuals (*e.g.*, Pl's Exs. 14-18), including but not limited to the AHCCCS Medical Policy Manual (Pl.'s Ex. 13), AHCCCS Fee-For-Service Manual (Pl.'s Ex. 19), AHCCCS Claims Clues, and Reporting Guides.

31. The PPA lists certain requirements for providers to follow (Pl.'s Ex. 1 at 16-20):

   (a) The provider agrees to maintain all records relating to performance of the PPA in compliance with all specifications for record-keeping established by AHCCCS, and to maintain all records in such detail as to reflect each service provided and all other costs and expenses of whatever nature for which payment is made to the provider;

   (b) The provider must comply with all federal, state, and local laws and rules governing or otherwise related to the performance of duties under the PPA;

   (c) The provider agrees to provide services, bill for services, accept payment, and otherwise follow all AHCCCS policies;

   (d) The provider warrants that it has the ability, authority, skill, expertise,

and capacity to perform and provide the services governed by the PPA;

(e) The provider must ensure that its electronic health records ("EHR") system is developed to accurately record, maintain, and reflect all original entries; and

(f) AHCCCS will suspend any payments to the provider pending an investigation of a "credible allegation of fraud" against the provider.

32. Alexis Curry signed the PPA on November 25, 2020, under penalty of law that the information she provided on the form was true, accurate, and complete to the best of her knowledge. (Pl.'s Ex. 1 at 20).

33. At the time that Alexis Curry submitted 1FC's AHCCCS application, there was an outstanding arrest warrant—issued in October 2018 for two state felony charges involving the fraudulent use of fictitious personal identification and obtaining a vehicle with intent to defraud—for Thvoughn Curry in Florida. (Pl.'s Ex. 25).

      iii. *1FC's Operations*

34. As represented on its AHCCCS application, 1FC only operated out of its primary practice location: a nine-room office space in Harris Park Professional Plaza, located at 1550 East McKellips Road, Suite 110, Mesa, Arizona 85203. (Pl.'s Exs. 1, 39).

35. 1FC publicly advertised the hours of business provided in its AHCCCS application. (Pl.'s Ex. 1 at 7; Pl.'s Ex. 37 at 141805).

36. As of April 2021, 1FC maintained the following "Daily Activities Schedule," consisting of 4 hours and 40 minutes of activities (Pl.'s Ex. 36 at 141779; Pl.'s Ex. 37 at 141808):

| 9:45 a.m. – 10:00 a.m. | Morning Meditation |
|---|---|
| 10:00 a.m. – 10:15 a.m. | Review Period |
| 10:15 a.m. – 11:15 a.m. | First Lesson |
| 11:15 a.m. – 11:30 a.m. | 15 min. Break |
| 11:30 a.m. – 12:30 p.m. | Second Lesson |
| 12:30 p.m. – 1:45 p.m. | Lunch Break |
| 1:50 p.m. – 3:00 p.m. | Third Lesson |
| 3:00 p.m. – 4:00 p.m. | Group Activity |
| 4:00 p.m. – 4:30 p.m. | Break until Transportation Arrives |

37. Thvoughn Curry went to 1FC's primary practice location at least twice a month to drop off checks. Daniel Brown, a 1FC employee, testified that he understood Thvoughn

Curry to be the owner of 1FC.  Clients at 1FC referred to Thvoughn Curry as "Mr. T." Alexis Curry was also seen at 1FC's office and was understood to be an owner of 1FC. Alexis Curry and Thvoughn Curry drove several different vehicles when visiting 1FC's office, including a Dodge Hellcat, Dodge Charger, a BMW, and a large truck.

38. As described by Daniel Brown, who was employed by 1FC from December 2022 to June 2023, anywhere between "25 to 30 plus" clients were present at 1FC's office in Mesa on a typical day.  1FC's clients would be transported from "houses" to the office.

39. There were at least five "houses":

(a) In Mesa, Arizona, there were two women's houses and one men's house. Each of the houses in Mesa housed between 8-12 individuals at a time.

(b) In the Phoenix/Glendale area, there was one men's house and one women's house.  There were, at most, 4 individuals living in the men's house and, at most, 6 individuals living in the women's house in Phoenix/Glendale at a time.

40. Daniel Brown described a typical day at 1FC between December 2022 and June 2023:

(a) The 1FC office was open Monday through Friday.  Saturdays were for special events, and no business took place on Sundays.

(b) Brown typically arrived at 1FC's office at around 7:00 a.m., got the keys to one of 1FC's company vehicles, and then drove to the houses to pick up clients.  1FC had at least four company vehicles, three of which Brown was able to remember:  one large Mercedes that could carry up to 20 people; one Mercedes minivan; and one Dodge minivan.

(c) Brown taught "classes" at 1FC's office in a group setting with the clients. Brown held only a high school diploma and had received no other formal training to provide such services.  Class started between 8:30 a.m. and 9:00 a.m., Monday through Friday.  Every client picked up from a house attended the group classes for the day.  Classes took place in one assigned room at the 1FC office.  (Pl.'s Ex. 39, Room 6).

(d) In these group classes, Brown hosted discussions with the clients, allowing every person to speak and "say fully whatever it is they wanted to say."  Brown offered advice to help clients out from time to time.  He also assigned and reviewed homework, went over the "word of the day," solved crossword puzzles, and watched movies with the clients during the classes.

(e) At noon, the clients took an hour-long lunch break.  Afterwards, clients

did "work sheets" related to different lessons planned by Brown. After the work sheets were completed, Brown took the clients to a nearby park before taking them back to their houses between 4:00 p.m. and 5:00 p.m.

(f) On Friday, clients only attended class for half of the day. After class, clients were taken out for certain activities, such as going to get a haircut or getting one's nails done.

(g) On Saturday, clients were picked up between 10:00 a.m. and 11:00 a.m. They were often taken to go see a movie and then get dinner afterwards.

(h) No activities took place on Sunday.

41. During Brown's time at 1FC, the company employed a total of three case managers, but only two worked at 1FC at the same time. Case managers assisted clients with receiving social services, setting up doctor's appointments, and finding visitation times with family members. Additionally, there was a counselor employed named "Wayman." On occasion, when Brown led group classes, Wayman would meet one-on-one with no more than three clients in a day if they wanted to speak with him. Wayman would see each client for 30-60 minutes on average. There were no other individual counseling sessions provided at 1FC other than those led by Wayman. Wayman also did not host any counseling sessions at the clients' houses.

42. Of the nine rooms in 1FC's office, only two were used to provide client services. Brown led the group classes in room 6, and Wayman's individual sessions occurred in room 3. The case managers worked in room 4. Rooms 8 and 9 were offices for 1FC employees. Children stayed and played in room 5 during the day. Room 1 was for the receptionist; room 2 was the kitchen; and room 7 was the restroom. (Pl.'s Ex. 39).

43. Once clients were back at the houses for the evening, they typically did their homework, ate dinner, and watched movies. Clients generally cooked for themselves; they received funds for food from Alexis Curry and Thvoughn Curry or relied on nutrition assistance programs to purchase groceries.

44. 1FC relied on its employees to manage the houses in the evenings (except for Sundays). Brown would spend one to two evenings a week at one of the houses. On those nights, Brown would eat dinner with the clients, watch movies with them, and upload his

written notes from the day onto 1FC's EHR software, ICANotes.  Brown did not lead any group classes at the houses in the evenings. Brown would usually depart the house by 10:00 p.m.

45. 1FC employees oversaw the houses for security.  Brown testified that there were cameras in every room of the houses, and that these cameras were monitored by Alexis Curry, Thvoughn Curry, and other 1FC employees.  Brown was occasionally called to manage issues at the houses, such as clients drinking alcohol.  When responding to such calls, Brown first went to the 1FC office, clocked in, got the keys to a company vehicle, and then drove to the house.

    iv.   *1FC's Total AHCCCS Billing*

46. 1FC began submitting billing claims to AHCCCS in February 2021.  Each claim consisted of a unique claim number, the AHCCCS identification number of the member receiving services, the beginning and end dates of service, and the total amount sought in reimbursement for all itemized services over the dates of service.  AHCCCS then could approve or deny each claim, in full or in part. (Pl.'s Ex. 4).

47. From February 17, 2021, to April 7, 2023, 1FC submitted 2,137 claims to AHCCCS.  All but four of these claims were identified as being submitted by Alexis Curry.  Thvoughn Curry was not listed as having submitted any claims.  (Pl.'s Ex. 4).  The 2,137 claims represented a total of 13,646 itemized services (or claim lines).  For every itemized service submitted, 1FC represented that it was providing outpatient services. (Pl.'s Ex. 2, "ALL SERVICES" tab).

48. In total, 1FC sought $12,776,465.75 from AHCCCS in billing reimbursement from February 2021 to April 2023.  (Pl.'s Ex. 4).  AHCCCS ultimately paid 1FC $12,360,053.46 for services claimed to have been rendered.  (Pl.'s Ex. 66 at 141935).

**C.  AHCCCS's Investigation into 1FC Based on a "Credible Allegation of Fraud"**

49. At some point in 2021, AHCCCS received a referral indicating a "credible allegation of fraud" against 1FC.  Loretta Lizarraga, an AHCCCS employee, led the investigation.

50. Lizarraga compared the AHCCCS application submitted by Alexis Curry in November

2020 with the 1FC's Articles of Organization, effective as of July 2020 and amended in October 2020. Lizarraga noticed an inconsistency: 1FC's AHCCCS application listed Alexis Curry as its sole owner, while its Articles of Organization listed Thvoughn Curry as the statutory agent, principal, organizer, and authorized agent, with Alexis Curry later added as a manager.

51. AHCCCS's Program Integrity Team ("PIT Team") then pulled all itemized services billed by 1FC. (Pl.'s Ex. 2 (the "BRHF-ALL")). When reviewing the data, Lizarraga noticed certain red flags that supported a credible allegation of fraud.

52. Lizarraga next created a random sample of the BHRF-ALL. From that random sample, she requested the medical records from 1FC that corresponded with the itemized services. In her review of the medical records, Lizarraga noticed missing signatures, dates, and progress notes, among other items.

53. 1FC was suspended by AHCCCS in April 2023—thus halting all reimbursement payments. 1FC appealed the suspension. The suspension was upheld by the agency.

     i. *Count 6:  Allegation of Health Care Fraud, Patient M.B.*

54. From May 9 to May 15, 2022—a seven-day period—1FC sought a total of $6,255.60 in reimbursement from AHCCCS for services provided to patient M.B. (AHCCCS ID ending in 4195). 1FC was paid the full $6,255.60. 1FC billed the following itemized services (Pl.'s Ex. 10; Pl.'s Ex. 2):

| CPT | Modifier | POS | Units | Hours | Billed | Paid |
|---|---|---|---|---|---|---|
| H0004 | HQ | 11 | 100 | 25 | $1,094.00 | $1,094.00 |
| H0004 | HQ | 12 | 56 | 14 | $612.64 | $612.64 |
| H2014 |  | 11 | 48 | 12 | $953.76 | $953.76 |
| H2027 |  | 12 | 72 | 18 | $1,459.44 | $1,459.44 |
| T1016 | HN | 11 | 40 | 10 | $766.80 | $766.80 |
| T1016 | HN | 12 | 48 | 12 | $1,368.96 | $1,368.96 |

55. Though 1FC had previously represented to AHCCCS that it was only open for 45 hours during a seven-day period, 1FC's billings for patient M.B. from May 9 to May 15, 2022,

totaled 69 hours of in-person service and 22 hours of case management.

56. From May 9 to May 15, 2022, 1FC submitted claims on behalf of 19 members:

(a) Over that period, 1FC billed a total of 2176 units, or 544 hours, of individualized face-to-face service (denoted by CPT code H0004, H2014, or H2027, *without* the HQ group modifier).

(b) 868 of the units, or 217 hours, were purportedly provided in an office setting. 1308 of the units, or 327 hours, were purportedly provided in a home setting.

(c) Thus, on average, 1FC claimed that it provided over 77 hours of individualized counseling *per day* over the period (including Saturday and Sunday): 31 hours per day in the office, and 46.7 hours per day at home.

(*See* Pl.'s Ex. 2, "ALL SERVICES" tab).[2]

57. Additionally, over the same period, 1FC billed a total of 1596 units, or 399 hours, of case management (denoted by CPT code T1016).

(a) 724 of the units, or 181 hours, were purportedly done in the office. 872 of the units, or 218 hours, were purportedly done at home.

(b) Thus, on average, 1FC claimed that it performed 57 hours of case management *per day* over the period (including Saturday and Sunday): 25.9 hours per day in the office, and 31.1 hours per day at home.

(*See* Pl.'s Ex. 2, "ALL SERVICES" tab).

ii. *Count 8: Allegation of Health Care Fraud, Patient F.C.*

58. From January 20 to January 25, 2023—a six-day period—1FC sought a total of $5,476.56 in reimbursement from AHCCCS for services provided to patient F.C. (AHCCCS ID ending in 4599). 1FC was ultimately paid $5,406.48. 1FC billed the following itemized services (Pl.'s Ex. 11 at 140489; Pl.'s Ex. 2):

//

//

//

---

[2]     To find the number of individualized face-to-face service hours, the Court filtered the data by (1) the beginning and end dates of service to be between 5/9/22 and 5/15/22; (2) the CPT codes to be either H0004, H2014, and H2027; and (3) blank modifiers. Unless otherwise stated, the Court followed this same method when filtering for case management service (by CPT code T1016, with modifier HN) and for other date ranges, as seen below.

| CPT | Modifier | POS | Units | Hours | Billed | Paid |
|-----|----------|-----|-------|-------|--------|------|
| H0004 |  | 11 | 4 | 1 | $182.08 | $112.00 |
| H0004 | HQ | 11 | 80 | 20 | $896.80 | $896.80 |
| H0004 | HQ | 12 | 48 | 12 | $538.08 | $538.08 |
| H2014 |  | 11 | 40 | 10 | $814.80 | $814.80 |
| H2027 |  | 12 | 60 | 15 | $1,246.80 | $1,246.80 |
| T1016 | HN | 11 | 32 | 8 | $628.80 | $628.80 |
| T1016 | HN | 12 | 40 | 10 | $1,169.20 | $1,169.20 |

59. Though 1FC had previously represented to AHCCCS that it was only open for 37 hours during the six-day period in question, 1FC's billings for patient F.C. from January 20 to January 25, 2023, totaled 58 hours of in-person service and 18 hours of case management.

60. From January 20 to January 25, 2023, 1FC submitted claims on behalf of 15 members:

   (a) Over that period, 1FC billed a total of 552 units, or 138 hours, of individualized face-to-face service (denoted by CPT code H0004, H2014, or H2027, *without* the HQ group modifier).

   (b) 252 of the units, or 63 hours, were purportedly provided in an office setting.  300 of the units, or 75 hours, were purportedly provided in a home setting.

   (c) Thus, on average, 1FC claimed that it provided 23 hours of individualized counseling *per day* over the period (including Saturday and Sunday): 10.5 hours per day in the office, and 12.5 hours per day at home.

   (*See* Pl.'s Ex. 2, "ALL SERVICES" tab).

61. Additionally, over the same period, 1FC billed a total of 404 units, or 101 hours, of case management (denoted by CPT code T1016).

   (a) 204 of the units, or 51 hours, were purportedly done in the office.  200 of the units, or 50 hours, were purportedly done at home.

   (b) Thus, on average, 1FC claimed that it performed over 16 hours of case management *per day* over the period (including Saturday and Sunday): 8.5 hours per day in the office, and 8.3 hours per day at home.

(*See* Pl.'s Ex. 2, "ALL SERVICES" tab).[3]

iii.    *Count 10:  Allegation of Health Care Fraud, Patient A.D.*

62. From August 2 to August 7, 2022—a six-day period—1FC sought a total of $10,549.78 in reimbursement from AHCCCS for services provided to patient A.D. (AHCCCS ID ending in 1704).   1FC was ultimately paid $7,028.28.   AHCCCS approved the following itemized services (Pl.'s Ex. 12; Pl.'s Ex. 2):

| CPT | Modifier | POS | Units | Hours | Billed | Paid |
|---|---|---|---|---|---|---|
| H0004 |  | 11 | 4 | 1 | $109.28 | $109.28 |
| H0004 | HQ | 11 | 80 | 20 | $875.25 | $875.20 |
| H0004 | HQ | 12 | 48 | 12 | $525.12 | $525.12 |
| H0004 | HQ | 11 | 80 | 20 | $875.25 | $612.64 |
| H0004 | HQ | 12 | 48 | 12 | $525.12 | $0.00 |
| H2014 |  | 11 | 40 | 10 | $794.80 | $794.80 |
| H2027 |  | 12 | 60 | 15 | $1,216.20 | $1,216.20 |
| T1016 | HN | 11 | 32 | 8 | $613.44 | $613.44 |
| T1016 | HN | 12 | 40 | 10 | $1,140.80 | $1,140.80 |
| T1016 | HN | 12 | 40 | 10 | $1,140.80 | $1,140.80 |

63. Additionally, AHCCCS denied the following itemized services (Pl.'s Ex. 12):

| CPT | Modifier | POS | Units | Hours | Billed | Paid |
|---|---|---|---|---|---|---|
| H0004 |  | 11 | 4 | 1 | $109.28 | $0.00 |
| H2014 |  | 11 | 40 | 10 | $794.80 | $0.00 |
| H2027 |  | 12 | 60 | 15 | $1,216.20 | $0.00 |
| T1016 | HN | 11 | 32 | 8 | $613.44 | $0.00 |

64. Though 1FC had previously represented to AHCCCS that it was only open for 37 hours during the six-day period in question, 1FC's *approved* billings for patient A.D. from

---

[3]    Furthermore, when widening the dataset by one day to capture a full week period, from January 20 to January 26, 2023, 1FC submitted claims for 37 members.  Over that period, 1FC billed 3576 units, or 894 hours, for individualized counseling services—averaging 127.7 hours per day over seven days.  It also billed 2580 units, or 645 hours, of case management—averaging 92.1 hours per day over seven days.  (Pl.'s Ex. 2).

August 2 to August 7, 2022, totaled 90 hours of in-person service and 28 hours of case management.  And when counting hours from the denied claims, 1FC submitted total billings for 116 hours of in-person service and 36 hours of case management over the six-day period for patient A.D.

65. From August 2 to August 7, 2022, 1FC submitted claims on behalf of 3 members:

(a) Over that period, 1FC billed a total of 316 units, or 79 hours, of individualized face-to-face service (denoted by CPT code H0004, H2014, or H2027, *without* the HQ group modifier).

(b) 136 of the units, or 34 hours, were purportedly provided in an office setting.  180 of the units, or 45 hours, were purportedly provided in a home setting.

(c) Thus, on average, 1FC claimed that it provided over 13 hours of individualized counseling *per day* over the period (including Saturday and Sunday):  5.7 hours per day in the office, and 7.5 hours per day at home.

(*See* Pl.'s Ex. 2, "ALL SERVICES" tab).

66. Additionally, over the same period, 1FC billed a total of 220 units, or 55 hours, of case management (denoted by CPT code T1016).

(a) 100 of the units, or 25 hours, were purportedly done in the office.  120 of the units, or 30 hours, were purportedly done at home.

(b) Thus, on average, 1FC claimed that it performed over 9 hours of case management per day over the period (including Saturday and Sunday):  4.2 hours per day in the office, and 5 hours per day at home.

(*See* Pl.'s Ex. 2, "ALL SERVICES" tab).[4]

**D.  Text Message Communications Between Alexis Curry and Thvoughn Curry**

67. A number of text message communications between Alexis Curry and Thvoughn Curry from August 2020 to January 2023 were admitted into evidence at trial.  (Pl.'s Ex. 36).[5]

---

[4]      Furthermore, when widening the dataset by one day to capture a full week period, from August 1 to August 7, 2022, 1FC submitted claims for 15 members.  Over that period, 1FC billed 1616 units, or 404 hours, for individualized counseling services—averaging 57.7 hours per day over seven days.  It also billed 1196 units, or 299 hours, of case management—averaging 42.7 hours per day over seven days.  (Pl.'s Ex. 2).

[5]      Texts from Thvoughn Curry were sent from a phone number ending in 6947, and texts from Alexis Curry were sent from a phone number ending in 3352.  (Pl.'s Ex. 34; Pl.'s Ex. 35).

68. On August 27, 2020, Defendants discussed how long warrants last (Pl.'s Ex. 36 at 141767-68):

| | |
|---|---|
| **Thvoughn Curry:** | Warrants last for 4 years right? |
| | . . . |
| | Asking cause we 2 yrs in |
| | It will drop off soon |
| **Alexis Curry:** | Yes |
| | . . . |
| **Thvoughn Curry:** | But I had looked it up yesterday and they say warrants last 4 yrs |
| | Maybe you can do your research or we can ask the lawyer when I call him for your sister |
| **Alexis Curry:** | Ok it's going on 3 years right baby |
| | Yes |
| **Thvoughn Curry:** | I think this year made 3 |
| | We found out when we 1st moved here |
| | So 2 and a half years |
| **Alexis Curry:** | Yes in 2018 |
| **Thvoughn Curry:** | Just have to look up how they last |

69. On November 14, 2020, Defendants exchanged messages regarding the business hours of 1FC (8:00 a.m. to 4:00 p.m. from Monday-Friday, 9:00 a.m. to 2:00 p.m. on Saturday, and closed on Sunday). (Pl.'s Ex. 36 at 141770-71).

70. On January 23, 2021, Alexis Curry asked Thvoughn Curry for her AHCCCS password and username. Thvoughn Curry sent the details. Alexis Curry replied with a screenshot of an image showing that her AHCCCS application for 1FC was currently in-review. (Pl.'s Ex. 36 at 141772).

71. On February 10, 2021, Alexis Curry asked for the bank account information to deposit AHCCCS checks. Thvoughn Curry responded with a screenshot from Bank of America's website that contained the account information. The account number in the screenshot matched that of the BofA x7401 account number. (Pl.'s Ex. 36 at 141774).

72. On April 21, 2021, Defendants exchanged a series of messages discussing 1FC's payroll, revenue from AHCCCS billing, the need for more clients, and getting billing to $6,500/week/client (Pl.'s Ex. 36 at 141776-78):

| | |
|---|---|
| **Thvoughn Curry:** | Did you see our payroll? |
| | 17k |

| | |
|---|---|
| **Alexis Curry:** | Thank you baby yes my usual please |
| **Thvoughn Curry:** | I ain't even pay Tracey yet [] |
| **Alexis Curry:** | Wtf are you serious bookie? . . . |
| **Thvoughn Curry:** | Very serious |
| **Alexis Curry:** | Damn that took a chunk of our money |
| **Thvoughn Curry:** | So from that calculation we looking at 40k-50k a month in payroll |
| **Alexis Curry:** | Good lord |
| **Thvoughn Curry:** | That's not business expenses or anything. |
| **Alexis Curry:** | We need more clients ASAP |
| **Thvoughn Curry:** | Yes. |
| | We at 200k a month right now and a little over if we can get this billing consistent love. |
| | 50-60k a week times 4 |
| | Then payroll won't be a problem |
| | We have to pay for the best right now so we can last |
| **Alexis Curry:** | That's good do they have that spread sheet for me to do billing tomorrow? |
| **Thvoughn Curry:** | We can make [$312,000] every month baby if you can get billing to 6500 a week per client. |
| | I will ask right now. |
| **Alexis Curry:** | Ok bookie |
| **Thvoughn Curry:** | And if I'm not mistaken I believe that's where we at |
| | We do a lot. |
| | We have to capture everything |

73. On April 26, 2021, Alexis Curry sent five billing codes: H2027; H2014; T1016; H0004(HQ); and H0004(individual). (Pl.'s Ex. 36 at 141780). On April 29, 2021, Thvoughn Curry asked Alexis Curry whether she was using those codes when doing AHCCCS billing (*Id.* at 141781):

| | |
|---|---|
| **Thvoughn Curry:** | I have a quick question. |
| | H2027 |
| | H2014 |
| | T1016 |
| | H0004(HQ) |
| | H0004(individual) |
| | Is these all the codes your using for billing love? |
| **Alexis Curry:** | Yes babe |
| | Why what happened?? |
| **Thvoughn Curry:** | Making sure everything right for you love. That's all |

74. On May 27, 2021, Defendants exchanged a series of texts discussing the need to get a

third house, establish another office, hire more staff, purchase two more vans, and ultimately increase billing to 80 clients per week to pull in over $1.9 million in reimbursement from AHCCCS (Pl.'s Ex. 36 at 141782-86):

| | |
|---|---|
| **Alexis Curry:** | All claims were approved baby through Ahcccs $77,971.91 |
| | They approved [client's] back bill |
| **Thvoughn Curry:** | F*** yeah |
| | We rich b**** |
| | . . . |
| | Next week billing for sure going to be 100k when we get the house |
| | . . . |
| **Alexis Curry:** | We'll be at 18 clients right? |
| | Or 19? |
| **Thvoughn Curry:** | 25 |
| | That's why we need the 3rd house |
| | . . . |
| | We have 14 now currently |
| **Alexis Curry:** | That's 152,095 |
| | We need another office definitely and more staff |
| | . . . |
| **Thvoughn Curry:** | 2 more vans |
| | 1 more transit |
| | 1 more caravan |
| | Can buy both when we cashing a 100k plus check. |
| **Alexis Curry:** | Yes fr fr we need a big big office and a big ass house 6 bedrooms |
| **Thvoughn Curry:** | Facts |
| | We need the transit van now though. |
| | The 1st one is to overfilled currently now |
| | We'll get that when we get the 77k check |
| | . . . |
| | This week billing is going to be fact |
| | . . . |
| | 40 clients |
| | We not stopping until we get that |
| | And 40 kids |
| | 960 a month |
| **Alexis Curry:** | This week billing will be 85,173 |
| | . . . |
| | 80 clients a week child that $486,704 a week |
| | $1,946,816 a month . . . |

| | Thvoughn Curry: | Now you can hire a company to do billing 80 clients that's a lot or I'll help you. Just have to teach me |
|---|---|---|

75. On June 3, 9, and 14 in 2021, Defendants continued to discuss AHCCCS billing and depositing checks.  (Pl.'s Ex. 36 at 141787-92).  Alexis Curry asked Thvoughn Curry for information regarding the 1FC's clients for billing purposes (*Id.* at 141792):

| | Alexis Curry: | How many clients had a full week last week? |
|---|---|---|
| | | . . . |
| | | I need how many new clients came in last week their intake date and if their insurance was changed the date it was changed and their diagnosis codes.  I also need a list of any clients that left last week and their date they left. |

76. On October 8, 2021, Alexis Curry shared with Thvoughn Curry the website link to view 1FC's check payments from AHCCCS every Friday.  (Pl.'s Ex. 36 at 141794).

77. On June 14, 2022, Thvoughn Curry asked Alexis Curry if she "want[ed] to do the *formula* for last week billing," reminding her that 1FC "didn't open up for Monday."  (Pl.'s Ex. 36 at 141795 (emphasis added)).  On June 17, 2022, Thvoughn Curry asked Alexis Curry to "resend the *modifications*" that she "did the other day" so that he could "start billing."  (*Id.* at 141796 (emphasis added)).  Alexis Curry then sent a text containing the following billing formula to determine the number of units to bill for services rendered to one client over four weekdays and the weekend (June 7, 2022—a Tuesday—through June 12, 2022—a Sunday) (*id.*):

| CPT | Modifier | POS | Units Billed (Four Weekdays + Weekend) |
|---|---|---|---|
| H0004 | HQ | 11 | 80 |
| H0004 | HQ | 12 | 48 |
| H2014 | | 11 | 40 |
| H2027 | | 12 | 60 |
| T1016 | HN | 11 | 32 |
| T1016 | HN | 12 | 40 |

This formula was identical to a billing formula sent by Alexis Curry on March 18, 2022, for another period covering four weekdays and the weekend (March 8, 2022—a

Tuesday—through March 13, 2022—a Sunday).  (*See* Pl.'s Ex. 38).

78. On August 31, 2022, Alexis Curry informed Thvoughn Curry that she could "knock out billing later" once he sends her "the client census of who all to bill for."  (Pl.'s Ex. 36 at 141797).

79. On October 13, 2022, Thvoughn Curry discussed the need to "fix the billing," stating that "[w]e need half a mill a week."  (Pl.'s Ex. 36 at 141798).  He also asked Alexis Curry whether she wanted to go on vacation for a month with a $50,000 budget.  (*Id.* at 141799).

80. On October 14, 2022, Thvoughn Curry sent a screenshot with a list of 39 pending claims submitted to AHCCCS.  He told Alexis Curry that "[i]f all them claims get approved," they would receive $200,000 in reimbursement.  (Pl.'s Ex. 36 at 141800-01; Pl.'s Ex. 37 at 141812).

81. On January 13, 2023, Thvoughn Curry stated that was "[d]oing billing right [n]ow" and sent a picture with the following three items visible:  (1) his computer screen, which displayed the AHCCCS website used by providers to input claims for itemized services; (2) an iPhone screenshot of a billing formula over an unspecified time period; and (3) a list of clients with personally identifying information, such as their AHCCCS IDs, diagnosis codes, and the dates they began receiving services.  (Pl.'s Ex. 36 at 141802; Pl.'s Ex. 37 at 141813).  The computer screen showed that Thvoughn Curry was logged into Alexis Curry's AHCCCS account and it displayed an IP address.  (Pl.'s Ex. 68 at 141871).  Additionally, Thvoughn Curry had input the following number of units for four itemized services from January 6, 2023 (Friday) to January 12, 2023 (Thursday) into the AHCCCS billing portal (*id.* at 141873):

| CPT | Modifier | POS | Units Billed (Five Weekdays + Weekend) |
|---|---|---|---|
| H0004 | HQ | 11 | 100 |
| H0004 | HQ | 12 | 56 |
| H2014 |  | 11 | 48 |
| H2027 |  | 12 | 72 |

82. On January 20, 2023, Alexis Curry sent images containing the billing formula for a client for services rendered over two weekdays and the formula for services rendered over three weekdays (Pl.'s Ex. 36 at 141803-04; Pl.'s Ex. 37 at 141815, 141818):

| CPT | Modifier | POS | Units Billed (Two Weekdays) | Units Billed (Three Weekdays) |
|---|---|---|---|---|
| H0004 | HQ | 11 | 40 | 60 |
| H0004 | HQ | 12 | 16 | 24 |
| H2014 | | 11 | 16 | 24 |
| H2027 | | 12 | 24 | 36 |
| T1016 | HN | 11 | 16 | 24 |
| T1016 | HN | 12 | 16 | 24 |

**E. 1FC's Billing Formula**

    i.   *Analysis of Billings From 12/20/2021 to 12/26/2021*

83. On January 10, 2022, 1FC received a payment of $77,170.34 from AHCCCS. The payment was deposited in the BofA x7401 account, which was under 1FC's name and had both Defendants listed on the signature card. (Pl.'s Ex. 67 at 141820-21; Pl.'s Ex. 4; Pl.'s Ex. 5).

84. The $77,170.34 payment from AHCCCS was reimbursement for claims submitted by Alexis Curry for 12 members for services rendered from December 18 to December 26, 2021. (Pl.'s Ex. 67 at 141822; Pl.'s Ex. 4). Of those 12 claims, 11 of the members were billed for services from December 20 to December 26, 2021 (one full week of services). The other one member was billed from December 18 to December 26, 2021 (one full week plus one weekend). (*Id.*).

85. For the common period of billing for all 12 members over December 20, 2021, to December 26, 2021, Alexis Curry submitted identical itemized services for each member—billing $6,364.88 per member over the full week. (Pl.'s Ex. 67 at 141822; Pl.'s Ex. 4).[6]

---

[6] For the one member that was also billed for receiving services on December 18, 2021 (Saturday), Alexis Curry submitted claims for additional reimbursement of $791.78, thus totaling $7,156.66 for that member specifically, and $77,170.34 for all 12 members.

86. The itemized services billed for *each* of the 12 members from December 20 to December 26, 2021, were:

| Date Range: 12/20/2021 – 12/26/2021 (the "5 Weekdays + Weekend" Formula) | | | | |
|---|---|---|---|---|
| **CPT** | **Modifier** | **POS** | **Units** | **Amount Billed** |
| H0004 | | 11 | 4 | $109.28 |
| H0004 | HQ | 11 | 100 | $1,094.00 |
| H0004 | HQ | 12 | 56 | $612.64 |
| H2014 | | 11 | 48 | $953.76 |
| H2027 | | 12 | 72 | $1,459.44 |
| T1016 | HN | 11 | 40 | $766.80 |
| T1016 | HN | 12 | 48 | $1,368.96 |

(Pl.'s Ex. 67 at 141824-25). This common billing pattern is referred to as the "5 Days + Weekend Formula" throughout this Order.

87. Though 1FC had previously represented to AHCCCS that it was only open for 45 hours during a seven-day period, 1FC's billings for *each* member from December 20 to December 26, 2021, totaled 70 hours of in-person service and 22 hours of case management. (Pl.'s Ex. 67 at 141831).

    ii.   *Matching the "5 Days + Weekend Formula" from Defendants' Text Messages*

88. AHCCCS investigators were able to match the "5 Days + Weekend Formula," as seen in 1FC's billings, with text messages sent between the Defendants. As identified from these messages, 1FC used the following billing formulas for a client for services rendered over (a) two weekdays; (b) three weekdays; and (c) four weekdays plus the weekend:[7]

//

//

//

---

[7]    The text messages did not indicate any number of units when billing H0004(11) by itself without the HQ modifier.

- 23 -

| | Units Billed | | |
|---|---|---|---|
| Billing Code | 2 Weekdays | 3 Weekdays | 4 Weekdays + Weekend |
| H0004(11) | | | |
| H0004(HQ)(11) | 40 | 60 | 80 |
| H0004(HQ)(12) | 16 | 24 | 48 |
| H2014(11) | 16 | 24 | 40 |
| H2027(12) | 24 | 36 | 60 |
| T1016(HN)(11) | 16 | 24 | 32 |
| T1016(HN)(12) | 16 | 24 | 40 |

89. Based on the billing formula for two weekdays and the billing formula for three weekdays, the following pattern is extrapolated for services rendered over any given number of weekdays:

| | Units Billed | | | | |
|---|---|---|---|---|---|
| Billing Code | 1 Weekday | 2 Weekdays | 3 Weekdays | 4 Weekdays | 5 Weekdays |
| H0004(11) | | | | | |
| H0004(HQ)(11) | 20 | 40 | 60 | 80 | 100 |
| H0004(HQ)(12) | 8 | 16 | 24 | 32 | 40 |
| H2014(11) | 8 | 16 | 24 | 32 | 40 |
| H2027(12) | 12 | 24 | 36 | 48 | 60 |
| T1016(HN)(11) | 8 | 16 | 24 | 32 | 40 |
| T1016(HN)(12) | 8 | 16 | 24 | 32 | 40 |

(Pl.'s Ex. 68 at 141846-48).

90. Next, based on the billing formula for four weekdays (as derived above) and the billing formula for four weekdays plus the weekend (as seen in the Defendants' text messages), the "Weekend Formula" is derived:

//

//

| | Units Billed | | |
|---|---|---|---|
| **Billing Code** | **4 Weekdays** | **"Weekend Formula"** | **4 Weekdays + Weekend** |
| H0004(11) | | | |
| H0004(HQ)(11) | 80 | +0 | 80 |
| H0004(HQ)(12) | 32 | +16 | 48 |
| H2014(11) | 32 | +8 | 40 |
| H2027(12) | 48 | +12 | 60 |
| T1016(HN)(11) | 32 | +0 | 32 |
| T1016(HN)(12) | 32 | +8 | 40 |

(Pl.'s Ex. 68 at 141850).  The "Weekend Formula" can then be appended to any of the weekday formulas to derive a modified formula as necessary (for example, if a client was billed from Thursday to Sunday, 1FC would use the two-weekday formula and add the Weekend Formula to reach the modified unit totals).

91. From there, the billing formula used by 1FC for any given number of days is derived:

| | Units Billed | | | | | |
|---|---|---|---|---|---|---|
| **Billing Code** | **1 Day** | **2 Days** | **3 Days** | **4 Days** | **5 Days** | **5 Days + Weekend** |
| H0004(11) | | | | | | |
| H0004(HQ)(11) | 20 | 40 | 60 | 80 | 100 | 100 |
| H0004(HQ)(12) | 8 | 16 | 24 | 32 | 40 | 56 |
| H2014(11) | 8 | 16 | 24 | 32 | 40 | 48 |
| H2027(12) | 12 | 24 | 36 | 48 | 60 | 72 |
| T1016(HN)(11) | 8 | 16 | 24 | 32 | 40 | 40 |
| T1016(HN)(12) | 8 | 16 | 24 | 32 | 40 | 48 |

(Pl.'s Ex. 68 at 141851).  This billing pattern matches the "5 Days + Weekend Formula" that 1FC followed when submitting identical itemized services for each of the 12 members from December 20 to December 26, 2021 (with the exception of H0004(11), which was not seen in the text messages).

- 25 -

### iii.    *Confirming the Formula Empirically*

92. The "5 Days + Weekend Formula" was seen throughout 1FC's submission of itemized services to AHCCCS. For example, in the week of December 30, 2022 (a Friday), to January 5, 2023 (a Thursday), 1FC submitted claims for 16 members. Of those 16 members, 1FC submitted claims for the full week (5 days plus weekend) for 14 members. Each of these 14 members were billed in accordance with the 5 Days + Weekend Formula.[8] (Pl.'s Ex. 68 at 141857-59).

93. Similarly, in the week of January 6, 2023 (a Friday), to January 12, 2023 (a Thursday), 1FC submitted claims for 15 members. Of those 15 members, 1FC submitted claims for the full week (5 days plus weekend) for 13 members in accordance with the 5 Days + Weekend Formula.[9] (Pl.'s Ex. 68 at 141872-78).

94. From January 3, 2022, through January 5, 2023 (a 368-day period), 1FC submitted approved claims for 67 different members for services rendered over 7-day periods (any instance where the beginning and end dates of service spanned five weekdays plus the weekend). 1FC billed a total of 4,705 itemized services for those members during that time span. For those approved services, whenever 1FC billed for a certain code, it billed the number of units corresponding with the 5 Days + Weekend Formula at the following rates:

//

//

//

//

//

---

[8]    The other two members were billed for two weekdays plus the weekend. Each member was billed either exactly or partially in the corresponding formula for two weekdays plus the weekend. (Pl.'s Ex. 68 at 141859-63).

[9]    One of the members was billed for one weekday exactly in the corresponding formula for one day. The other member was billed for five weekdays plus the weekend in a manner corresponding the with 5 Days + Weekend Formula, but 56 additional units of H0004(HQ)(12) and 48 additional units of T1016(HN)(12) were billed—a double-billing accident done in accordance with the "5 Days + Weekend Formula." (Pl.'s Ex. 68 at 141874-76).

| Billing Code | Time Period:  01/03/22–01/05/23 Dataset:  Approved Itemized Services for 7-Day Service Claims | |
| --- | --- | --- |
| | Units Billed (Corresponding with 5 Days + Weekend Formula) | Frequency at which Number of Units was Billed |
| H0004(11) | 4 | 100.00% |
| H0004(HQ)(11) | 100 | 99.82% |
| H0004(HQ)(12) | 56 | 96.77% |
| H2014(11) | 48 | 96.69% |
| H2027(12) | 72 | 91.98% |
| T1016(HN)(11) | 40 | 99.89% |
| T1016(HN)(12) | 48 | 96.70% |

(Pl.'s Ex. 68 at 141833-42).  For example, the table above demonstrates that whenever 1FC submitted an itemized claim for H0004(11), it billed 4 units for that service *every single time*.

    iv.  *Overall Summary Statistics of 1FC's AHCCCS Billing*

95. From February 2021 through March 2023, 1FC submitted claims for 178 members when using a combination of the three face-to-face service codes (H0004, H2014, and H2027) and the one case management code (T1016).  Over this period, on average, 1FC billed 9.6 hours of face-to-face services for each member per day billed, and 2.7 hours of case management services for each member per day billed—culminating in *an average of 12.3 hours of service for each member per day billed*.[10]  (Pl.'s Ex. 68 at 141879-85).

96. Over this 50-month period, there were nine members who were purported to have received services for more than 365 days (ranging from 383 days to 615 days), for an average of 13.1 hours of services per day billed—netting 1FC $3.78 million from AHCCCS from these nine members alone.  (Pl.'s Ex. 68 at 141885).

---

[10]    These calculations give 1FC the benefit of the doubt and assume that services were rendered on Sundays—even though 1FC represented to AHCCCS that it was closed on Sunday.

1    97. 1FC's case management billing was extremely high.  For example:

2       (a) In the week of December 30, 2022, to January 5, 2023, 1FC billed a total
3           of 328 hours of case management (T1016) across 16 members.

4       (b) From May 9 to May 15, 2022, it billed a total of 399 hours of case
5           management across 19 members.

6       (c) From August 1 to August 7, 2022, it billed a total of 299 hours of case
           management across 15 members.

7    To accomplish that amount of case management, 1FC would have needed to hire at

8    least five case managers working at or more than 60 hours per week.

9    **F.  Money Laundering (Counts 16-17, 20, 22-26)**

10   98. From March 2, 2021, to March 23, 2022, AHCCCS deposited a total of $6,105,447.44

11   in 1FC's BofA x7401 account.  (Pl.'s Ex. 76 at 141922-24).  This dollar amount

12   matched AHCCCS's records of 1FC claims submitted and approved from February 24,

13   2021, through March 23, 2022.  (Pl.'s Ex. 75 at 141918-21; Pl.'s Ex. 77).

14   99. From March 2, 2021, to March 25, 2022, the BofA x7401 account had a total of

15   $6,389,037.95 in inflows.  95.56% of those inflows consisted of payments from

16   AHCCCS ($6,105,447.44, as described above).  3.03% of those inflows ($193,489.27)

17   consisted of transfers from three other 1FC accounts:  BofA x8136, BofA x8149, and

18   BofA x6094.  A significant source of funding for these three accounts comprised of

19   deposits from the BofA x7401 account itself.  (Pl.'s Exs. 79-81).  The remaining 1.41%

20   of inflows ($90,101.24) consisted of a combination of returned items, cash, and other

21   miscellaneous transactions.  (Pl.'s Ex. 91).

22   100.   From March 1, 2021, to March 25, 2022, the total balance of the BofA x7401

23   account rose from $0.16 to $172,025.97.  (Pl.'s Ex. 90).

24            i.   *Count 20:  Land Rover of North Scottsdale*

25   101.   On May 12, 2021, 1FC filled out a withdrawal slip of $54,000.00 from the BofA

26   x7401 account.  From that withdrawal, 1FC purchased a cashier's check of $54,000.00,

27   payable to Land Rover of North Scottsdale.  (Pl.'s Ex. 92 at 62980, 62982).

28   102.   Thvoughn Curry used the cashier's check to finance the purchase of a 2021 Land

Rover Range Rover vehicle from Jaguar Land Rover North Scottsdale.  (Pl.'s Ex. 92 at 5363).

### ii.    *Count 22:  Courtesy CDJR*

103.    On October 13, 2021, 1FC filled out a withdrawal slip of $34,500.00 from the BofA x7401 account.  From that withdrawal, 1FC purchased a cashier's check of $32,000.00, payable to Courtesy CDJR.  (Pl.'s Ex. 93 at 63199, 63202).

104.    Alexis Curry used the cashier's check to finance the purchase of a 2021 Ram 1500 vehicle from Courtesy CDJR of Superstition Springs.  (Pl.'s Ex. 93 at 4612; Pl.'s Ex. 51 at 4627, 4646-4648).

### iii.    *Count 23:  Earnhardt Buick GMC*

105.    On January 24, 2022, 1FC filled out a withdrawal slip of $126,542.72 from the BofA x7401 account.   From that withdrawal, 1FC purchased a cashier's check of $126,542.72, payable to Earnhardt Buick GMC.  (Pl.'s Ex. 94 at 62877, 62879).

### iv.    *Count 24:  Mercedez Benz of Gilbert*

106.    On February 5, 2022, 1FC filled out a withdrawal slip of $116,000.00 from the BofA x7401 account.   From that withdrawal, 1FC purchased a cashier's check of $116,000.00, payable to Mercedes Benz of Gilbert.  (Pl.'s Ex. 95 at 62889, 62891).

107.    The 1 Family Clinic Business Trust used the cashier's check to finance the purchase of a 2022 Mercedes LT GLE 43 C4 vehicle from Mercedez Benz of Gilbert.  A copy of Thvoughn Curry's driver's license was submitted as a part of the vehicle purchase agreement.  (Pl.'s Ex. 95 at 5561-62).

### v.    *Count 25:  Pioneer Title*

108.    On February 18, 2022, 1FC filled out a withdrawal slip of $10,665.10 from the BofA x7401 account.  From that withdrawal, 1FC purchased a cashier's check of $10,665.10, payable to Pioneer Title.  (Pl.'s Ex. 96).

### vi.    *Count 26:  Scottsdale Ferrari/Maserati*

109.    On March 16, 2022, 1FC filled out a withdrawal slip of $298,243.92 from the BofA x7401 account.   From that withdrawal, 1FC purchased a cashier's check of

$298,243.92, payable to Scottsdale Ferrari/Maserati.  (Pl.'s Ex. 97 at 62906, 62908).

110.    D.A.T. Auto Group LLC used the cashier's check to finance the purchase of a 2019 Lamborghini Urus vehicle from Scottsdale Ferrari.  Thvoughn Curry signed the vehicle purchase agreement. (Pl.'s Ex. 97 at 129456-57). Thvoughn Curry was the sole statutory agent, member, manager, and organizer of D.A.T. Auto Group LLC.  (Pl.'s Ex. 23).

### vii.    *Count 16:  CDJR Superstition Springs*

111.    On March 16, 2022, 1FC filled out a withdrawal slip of $91,923.29 from the BofA x7401 account.  From that withdrawal, 1FC purchased a cashier's check of $91,923.29, payable to CDJR of Superstition Springs.  (Pl.'s Ex. 98 at 62909, 62911).

112.    Curry's Enterprise LLC used the cashier's check to finance the purchase of a 2022 Ram 1500 vehicle from Courtesy CDJR of Superstition Springs.   Thvoughn Curry signed the vehicle purchase agreement.  (Pl.'s Ex. 98 at 4767).  Thvoughn Curry was the sole statutory agent and organizer of Curry's Enterprise LLC.  Both Alexis Curry and Thvoughn Curry were managers of Curry's Enterprise LLC.  (Pl.'s Ex. 24).

### viii.    *Count 17:  WFG Title*

113.    On March 25, 2022, 1FC filled out a withdrawal slip of $314,094.12 from the BofA x7401 account.    From that withdrawal, 1FC purchased a cashier's check of $303,912.60, payable to WFG Title.  (Pl.'s Ex. 99 at 62919, 62925).

114.    D.A.T. Auto Group LLC used the cashier's check to finance the purchase of real estate, located at 630 N Windsor, Mesa, Arizona 85213.  (Pl.'s Ex. 99 at 123599-600).

## CONCLUSIONS OF LAW

### A.  Conspiracy (18 U.S.C. § 1349)

#### i.    *Count 1:  Conspiracy to commit wire fraud and healthcare fraud*

1.  The Government alleges that Defendants entered a conspiracy to commit healthcare fraud and wire fraud from July 2020 through December 2023.  The Government has met its burden beyond a reasonable doubt in establishing that Defendants conspired to commit healthcare fraud.

2.  First, the Government has proven, beyond a reasonable doubt, that there was an agreement between Thvoughn Curry and Alexis Curry to commit healthcare fraud, in violation of 18 U.S.C. § 1347, beginning in July 2020 and continuing through December 2023.  *See* 18 U.S.C. § 1349; Ninth Circuit Manual of Model Criminal Jury Instructions § 11.1 (2022 ed., updated June 2024).

3.  There was a plan between the Defendants to defraud AHCCCS, a healthcare benefit program.  The plan started at the time of 1FC's formation in July 2020.  (Pl.'s Ex. 21).  It continued when Defendants in November 2020 submitted a false application to AHCCCS to conceal Thvoughn Curry's involvement in 1FC.  The AHCCCS application asked, for any individual with an ownership interest in 1FC, whether there were any "pending proceedings, such as but not limited to an indictment, pending plea, or *investigation*, that could result in any *sanction, conviction, or action*."  (Pl.'s Ex. 1 at 14 (emphasis added)).  Defendants knew that Thvoughn Curry had an arrest warrant from Florida—issued in October 2018—stemming from state felony fraud charges.  (Pl.'s Ex. 25).  In August 2020, prior to submitting the application, Defendants discussed how long warrants lasted and noted that the arrest warrant in question was issued in 2018.  (Pl.'s Ex. 36 at 141767-68).  Defendants thus were aware that Thvoughn Curry's active arrest warrant posed a problem for the approval of 1FC's AHCCCS application.

4.  To avoid this problem, Defendants conspired to submit a false application to AHCCCS.  In October 2020, Alexis Curry submitted documentation with the Arizona Corporation Commission adding herself as a manager for 1FC.  (Pl.'s Ex. 22).  Alexis Curry then omitted any mention of Thvoughn Curry's name throughout 1FC's AHCCCS application.  (*See generally* Pl.'s Ex. 1).  Alexis Curry falsely represented in the application that she was the 100% owner of 1FC.  (*Id.* at 12).  She then falsely represented that there were no pending proceedings, such as an investigation, against any individuals with ownership interest in 1FC that could result in any sanction, conviction, or action (*id.* at 14)—even though Thvoughn Curry was an owner of 1FC

1    and had an active arrest warrant at the time the application was submitted.

2    5.  These false representations were material—they had the tendency to influence
3        AHCCCS to part with money.  Julie Culton, an employee in AHCCCS's Office of
4        Inspector General, testified that an entity seeking to become an AHCCCS provider
5        needed to be properly vetted by AHCCCS before securing approval.  Had AHCCCS
6        known about Thvoughn Curry's involvement in 1FC, AHCCCS likely would have
7        delayed its decision on the application and elevated it to a second-level review, which
8        could have resulted in the denial of 1FC's application.

9    6.  Upon the approval of 1FC's application to provide outpatient services, Defendants next
10       formed an agreement to fraudulently bill AHCCCS for purported services.  As
11       demonstrated by their text messages (*see* Pl.'s Ex. 36 at 141776-78, 141780, 141787-
12       92, 141795, 141797-98, 141802-04), both Defendants submitted claims to AHCCCS
13       for reimbursement, sharing the username and password for Alexis Curry's 1FC
14       AHCCCS account.  (Pl.'s Ex. 36 at 141772).  All but four of the claims submitted to
15       AHCCCS from February 2021 to April 2023 were submitted through this account.
16       (Pl.'s Ex. 4).

17   7.  Defendants' text messages further demonstrate that Defendants agreed to submit
18       billings in accord with a predetermined formula—the "5 Days + Weekend Formula"—
19       which allowed for modifications depending on the number of days that a client
20       purportedly received services.  The formula did not reflect services actually provided.
21       (*See* Pl.'s Ex. 36 at 141780-81, 141795-96, 141802-04; *see also* Pl.'s Ex. 38).

22   8.  Defendants' billing formula was pervasive throughout 1FC's billing submissions.
23       From January 3, 2022, to January 5, 2023, 1FC used a set number of units for each CPT
24       code, billing that set number for all or nearly all instances of that code for 7-day period
25       claims:

26   //
27   //
28   //

| Billing Code | Time Period: 01/03/22–01/05/23 Dataset: Itemized Services for Approved 7-Day Service Claims | |
| --- | --- | --- |
| | Units Billed (Corresponding with 5 Days + Weekend Formula) | Frequency at which Number of Units was Billed |
| H0004(11) | 4 | 100.00% |
| H0004(HQ)(11) | 100 | 99.82% |
| H0004(HQ)(12) | 56 | 96.77% |
| H2014(11) | 48 | 96.69% |
| H2027(12) | 72 | 91.98% |
| T1016(HN)(11) | 40 | 99.89% |
| T1016(HN)(12) | 48 | 96.70% |

(Pl.'s Ex. 68 at 141833-42).  From February 2021 through March 2023, 1FC's average daily billing was 12.3 hours of service per member, including 9.6 hours of face-to-face treatment (through a mix of in-office and at-home services) and 2.7 hours of case management.  (Pl.'s Ex. 68 at 141879-85).

9. The formula and average billing hours were not in accordance with the hours of operation that 1FC represented in its AHCCCS application.  There, it stated that its primary practice location—the only physical office space used by 1FC—would be open from 8:00 a.m. to 4:00 pm from Monday to Friday; 9:00 a.m. to 2:00 p.m. on Saturday; and closed on Sunday (totaling 45 hours a week).  (Pl.'s Ex. 1 at 7).  1FC also advertised, on a flyer shared by Defendants via text messages, that it had those same hours of business.  (Pl.'s Ex. 37 at 141805).  Moreover, 1FC's "Daily Activities Schedule" (also circulated between Defendants in their text messages) indicated that only a total of 4 hours and 40 minutes of group activities or lessons were planned at the primary practice facility each day.  (*Id.* at 141808).  Yet under the 5 Days + Weekend Formula, 1FC billed as if a member received 69 or 70 hours of services per week (depending on if 1FC used the H0004(11) code).  On any given week, based on the formula, a member was expected to receive:

(a) 39 hours of group services and 30-31 hours of individualized counseling.

(b) 37-38 hours of services in the office and 32 hours of services at home.

10. Loretta Lizarraga, an investigator with AHCCCS, testified that an AHCCCS-approved provider is expected to bill for services according to its designated provider type (here, outpatient services) and for hours in accordance with the hours of operation submitted to AHCCCS.  But here, 1FC did not inform AHCCCS that it would be providing additional hours of service outside of its primary practice location—another material omission in 1FC's AHCCCS application.

11. The number of hours billed by 1FC per patient was not typical of those seen at an outpatient facility, which generally only provide a low number of hours of care per date of service, in contrast with a BHRF or an inpatient treatment facility.  These high billings resulted in a large windfall for 1FC.  When following the 5 Days + Weekend formula, 1FC expected to receive ~$6,300 from AHCCCS for each patient every week.  (*See, e.g.*, Pl.'s Ex. 10).  Yet if 1FC was licensed to operate as a BHRF, where its clients would receive constant supervision, 24 hours a day, it would have only received ~$2,100 from AHCCCS for each patient every week to provide housing, oversight, and behavioral health services—a third of the amount it was billing for as an outpatient provider.

12. Nor were the hours submitted in accordance with what occurred at 1FC's office and houses.

(a) Daniel Brown, an employee of 1FC from December 2022 to June 2023, testified that only he provided group lessons at the facility, in general accordance with the hours listed on the Daily Activities Schedule. Brown held only a high school diploma and had received no other formal training to provide such services.  His lessons generally consisted of group discussions, doing crossword puzzles and worksheets, and watching movies.  Brown did not lead any group sessions at the clients' houses.

(b) Additionally, there was only one individual, Wayman, at 1FC's primary practice facility who provided one-on-one client services for usually no more than three clients a day, for 30-60 minutes per session.  Wayman did not host any individual counseling sessions at the clients' houses.

Moreover, there was only one room at 1FC's primary practice location where individualized counseling sessions were offered (Pl.'s Ex. 39, Room 3), making it utterly impossible that 1FC would be able to offer 30 to 31 hours of individualized counseling per week for each member.

(c) Furthermore, there were only two case managers working at 1FC's primary practice facility at the same time—far shy of the five case managers needed, each working more than 60 hours a week, to meet the number of case management hours that 1FC billed for certain weeks.

13. Second, the Government has proven, beyond a reasonable doubt, that each Defendant knowingly and willfully participated in the conspiracy to further its object of healthcare fraud. *See* 18 U.S.C. §§ 1347, 1349; Ninth Circuit Manual of Model Criminal Jury Instructions § 11.1 (2022 ed., updated June 2024).

14. Defendants knowingly participated in the conspiracy. An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident. Ninth Circuit Manual of Model Criminal Jury Instructions § 4.8 (2022 ed., updated Sept. 2022). As described above, Defendants shared details of the 1FC AHCCCS login credentials, devised the formula for billing submissions, and submitted claims to AHCCCS. They jointly opened four bank accounts under 1FC's name to receive payment from AHCCCS. (Pl.'s Exs. 70, 74, 78-81).

15. As further evidenced by their text messages, Defendants were motivated to participate in the conspiracy in order to fund their luxury lifestyle. From the beginning of March 2021 to the end of March 2022, the total balance on Defendants' BofA x7401 account rose from $0.16 to $172,025.97. (Pl.'s Ex. 90). Defendants discussed the need to get "more clients ASAP" to reach a goal of $312,000 in AHCCCS payments every month. (Pl.'s Ex. 36 at 141776-78). That goal continued to increase as the Defendants began billing for more clients. (*Id.* at 141798 ("We need half a mill a week"); *id.* at 141782-86 ("80 clients a week child that $486,704 a week")). They mentioned a month-long vacation with a $50,000 budget. (*Id.* at 141799). 1FC ultimately received over $12 million from AHCCCS for services that were purportedly rendered. (Pl.'s Ex. 66 at 141935). It billed, on average, more than $67,000 for each member that it purportedly

1    treated.  (Pl.'s Ex. 68).  With the proceeds of their conspiracy, Defendants were able to

2    purchase real estate and luxury vehicles (*see* Pl.'s Exs. 92-99), including a ~$300,000

3    2019 Lamborghini Urus (Pl.'s Ex. 97).

16. Additionally, Defendants willfully participated in the conspiracy.  In the healthcare

fraud context, a "willful" act is one undertaken with a "bad purpose" with knowledge

that the conduct was, in a general sense, unlawful.  *See United States v. Awad*, 551

F.3d 930, 939 (9th Cir. 2009) (quoting *Bryan v. United States*, 524 U.S. 184, 191-92

(1998)); 18 U.S.C. § 1347(b); (*see also* Doc. 128 at 3).  The Government need not prove

that the defendant had "actual knowledge" of the federal healthcare fraud statute or had

the "specific intent to commit a violation" of the statute.  18 U.S.C. § 1347(b).  Willful

intent "can be inferred from efforts to conceal the unlawful activity, from

misrepresentations, from proof of knowledge, and from profits."  *United States v.

Dearing*, 504 F.3d 897, 901 (9th Cir. 2007) (quoting *United States v. Davis*, 490 F.3d

541, 549 (6th Cir. 2007)).

17. Defendants' actions were undertaken with a bad purpose with knowledge that the

conduct was generally unlawful.  As described above, Defendants were aware that

Thvoughn Curry's active arrest warrant could hinder the approval of their AHCCCS

application—so they concealed him from the application altogether.  In the Provider

Participation Agreement (PPA), signed by Alexis Curry, 1FC acknowledged that it

would comply with all federal, state, and local laws and rules governing the

performance of its duties as an outpatient provider.  (Pl.'s Ex. 1 at 16-20).  1FC

warranted that it had the ability, authority, skill, expertise, and capacity to perform and

provide outpatient services; agreed to bill for services provided; and acknowledged that

AHCCCS would suspend any payments to 1FC pending an investigation of a "credible

allegation of fraud."  Defendants were thus aware that the submission of claims to

AHCCCS for services not actually rendered was generally impermissible under the law.

18. Finally, Defendants acted with the intent to defraud that is, the intent to deceive and

cheat.  Intent to defraud may be proven through reckless indifference to the truth or

1    falsity of statements.  *Dearing*, 504 F.3d at 903.  By billing in accordance with a

2    predetermined billing formula, Defendants demonstrated a reckless indifference to the

3    truth or falsity of their claim submissions.  Defendants were focused on obtaining as

4    many clients as possible at 1FC to increase their total payments from AHCCCS.  (Pl.'s

5    Ex. 36 at 141776-78, 141782-86).  Defendants took advantage of the American Indian

6    Health Program (AIHP), which used fee-for-service billing, to receive direct payments

7    from AHCCCS.  The presence of clients at the 1FC houses maintained the air of

8    legitimacy around 1FC's operations.  Defendants incentivized 1FC's clients to remain

9    at the houses by taking them to outings, watching movies with them, and covering their

10   shelter costs.  By housing its clients, Defendants believed that 1FC would be able to

11   claim that it was providing group outpatient services at home, in accordance with

12   Defendants' billing formula, even though no such services were rendered at the houses.

13   19. Defendants thus are GUILTY on Count 1 of the superseding indictment.[11]

14      **B.  Wire Fraud (18 U.S.C. § 1343)**

15      ii.   *Count 2:  $77,170.34 wire transfer from AHCCCS to Defendants on 1/10/2022*

16   20. The Government alleges that Defendants committed wire fraud by causing AHCCCS

17      to wire $77,170.34 to Defendants' BofA x7401 account on January 10, 2022, based on

18      claims for services rendered between December 18 and December 26, 2021.  But the

19      Government has failed to prove that the Defendants used an interstate wire

20      communication to carry out an essential part of their scheme.  *See* 18 U.S.C. § 1343;

21      Ninth Circuit Manual of Model Criminal Jury Instructions § 15.35 (2022 ed., updated

---

[11]    Defendants submit that the Court must also find that one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy. (Doc. 127 at 2).  The Government has proved the commission of at least one overt for each Defendant beyond a reasonable doubt.  Both Defendants committed several overt acts, including creating the 1FC entity (Thvoughn Curry), submitting the AHCCCS application (Alexis Curry), opening the four 1FC Bank of America accounts to receive AHCCCS deposits (Alexis Curry and Thvoughn Curry), and billing AHCCCS for purported outpatient services (Alexis Curry and Thvoughn Curry).  Regardless, a conspiracy charge brought under 18 U.S.C. § 1349 does not require the Government to prove an overt act. *See* 18 U.S.C. § 1349; *Whitfield v. United States*, 543 U.S. 209, 213-14 (2005); *see also United States v. Roy*, 783 F.3d 418, 420 (2d Cir. 2015) (adopting the finding of "many other Circuits" that a § 1349 conviction "does not require proof of an overt act" (citing string of cases)).

Sept. 2025).

21. The Government introduced testimony that the AHCCCS mainframe server—through which all provider billing claims travel—was located in Arizona in 2017 and is located in Colorado in 2026.  But it offered no other evidence or testimony as to the location of the server in the interim.

22. The claims corresponding with the $77,170.34 wire transfer from AHCCCS to the BofA x7401 account were submitted by Defendants sometime between December 26, 2021, and January 10, 2022.  With no evidence of the server's location during this brief period, the Government has not provided sufficient evidence to support a conviction of wire fraud.

23. Defendants thus are NOT GUILTY on Count 2 of the superseding indictment.

**C.  <u>Health Care Fraud (18 U.S.C. § 1347)</u>**

iii.  <u>*Count 6:  Billing of $6,255.60 related to patient M.B. on 5/20/2022*</u>

24. First, Defendants knowingly and willfully executed a scheme to defraud AHCCCS by means of materially false or fraudulent pretenses, representations, or promises. *See* 18 U.S.C. § 1347; Ninth Circuit Manual of Model Criminal Jury Instructions § 15.42 (2022 ed.).  The general scheme utilized by Defendants is described above in the conspiracy count section.  From May 9 to May 15, 2022 (five weekdays plus the weekend), Defendants submitted a claim of $6,255.60 for patient M.B., following the exact pattern of the 5 Days + Weekend Formula for the CPT codes billed.  1FC represented that it had provided patient M.B. with 69 hours of face-to-face treatment and 22 hours of case management during this single week.  Further, 1FC's primary practice location was purportedly open for only 45 hours that week.  (Pl.'s Ex. 10; Pl.'s Ex. 2).  1FC's claim for patient M.B. was a materially false statement that had the natural tendency to influence AHCCCS to part with money, as it gave AHCCCS the impression that 1FC was providing legitimate outpatient services to patient M.B. over the period in question.

25. Second, Defendants acted with the intent to defraud.  Defendants' intent to defraud, generally, is described above in the conspiracy count section.  Defendants demonstrated

1  a reckless indifference to truth or falsity of their claim submission for patient M.B. by

2  following the 5 Days + Weekend formula.  Moreover, 1FC frequently submitted claims

3  on behalf of patient M.B.—from February 2021 to March 2023, 1FC billed for 455 days

4  of service purportedly provided to M.B., for over 13 hours of service per day, netting

5  1FC a total $420,177.36 in reimbursements for this one patient alone.

6  26. Additionally, Defendants' intent to defraud is further evidenced by their total billings

7  for the week of May 9 to May 15, 2022.  During that week, 1FC billed a total of 544

8  hours of individualized counseling (77+ hours/day, including the weekend) and 399

9  hours of case management (57 hours/day, including the weekend) across 19 members—

10  figures that, on their face, are not credible and demonstrate a reckless indifference to

11  truth or falsity of the submissions.  (*See* Pl.'s Ex. 2, "ALL SERVICES" tab).  For

12  example, 1FC would have needed 9 counselors and 6 case managers, each working

13  more than 60 hours per week, to meet those billing numbers.  But based on the size and

14  configuration of 1FC's office, 1FC would not have been able to fit all these employees

15  in its office space.  (*See* Pl.'s Ex. 39 (Room 3 was for the individual counselor and room

16  4 was for the case managers)).

17  27. Third, AHCCCS is a healthcare benefit program.  AHCCCS is Arizona's federally

18  funded Medicaid agency.  The purpose of AHCCCS is to administer healthcare services

19  to low-income residents of Arizona.

20  28. Fourth, the scheme in question was executed in connection with payment of $6,255.60

21  for the purported 91 hours of healthcare services provided to patient M.B. from May 9

22  to May 15, 2022.  (Pl.'s Ex. 10; Pl.'s Ex. 2).

23  29. Defendants thus are GUILTY on Count 6 of the superseding indictment.

24      iv.    *Count 8:  Billing of $5,476.56 related to patient F.C. on 1/27/2023*

25  30. First, Defendants knowingly and willfully executed a scheme to defraud AHCCCS by

26  means of materially false or fraudulent pretenses, representations, or promises.  The

27  general scheme utilized by Defendants is described above in the conspiracy count

28  section.  From January 20 to January 25, 2023 (four weekdays plus the weekend),

Defendants submitted a claim of $5,476.56 for patient F.C., following a modified version of the 5 Days + Weekend Formula for the CPT codes billed. Defendants discussed this modified version of the formula—for 4 weekdays plus the weekend—via text messages. (Pl.'s Ex. 36 at 141795-96; Pl.'s Ex. 38). 1FC represented that it had provided patient F.C. with 58 hours of face-to-face treatment and 18 hours of case management over the six-day period. Further, 1FC's primary practice location was purportedly open for only 37 hours over that time. (Pl.'s Ex. 11; Pl.'s Ex. 2). 1FC's claim for patient F.C. was a materially false statement that had the natural tendency to influence AHCCCS to part with money, as it gave AHCCCS the impression that 1FC was providing legitimate outpatient services to patient F.C.

31. Second, Defendants acted with the intent to defraud. Defendants' intent to defraud, generally, is described above in the conspiracy count section. Defendants demonstrated a reckless indifference to truth or falsity of their claim submission for patient F.C. by following the modified formula.

32. Additionally, Defendants' intent to defraud is further evidenced by their total billings for the six-day period of January 20 to January 25, 2023. During that time, 1FC billed 138 hours of individualized counseling (23 hours/day, including the weekend) for 15 members—figures that, on their face, are not credible and demonstrate a reckless indifference to truth or falsity of the submissions. (*See* Pl.'s Ex. 2, "ALL SERVICES" tab). Daniel Brown testified that, from at least December 2022 to June 2023, only one individual—Wayman—provided individualized counseling at the office, for at most 3 hours a day. Brown also testified that Wayman did not, nor did anyone else, provide individualized counseling at the houses. Thus, Defendants' individual counseling billing would not have been possible to achieve if only Wayman was offering such services.

33. Third, AHCCCS is a healthcare benefit program. AHCCCS is Arizona's federally funded Medicaid agency. The purpose of AHCCCS is to administer healthcare services to low-income residents of Arizona.

34. Fourth, the scheme in question was executed in connection with payment of $5,406.48 for the purported 76 hours of healthcare services provided to patient F.C. from January 20 to January 25, 2023.  (Pl.'s Ex. 11; Pl.'s Ex. 2).

35. Defendants thus are GUILTY on Count 8 of the superseding indictment.

v.    _Count 10:  Billing of $10,549.78 related to patient A.D. on 8/12/2022_

36. First, Defendants knowingly and willfully executed a scheme to defraud AHCCCS by means of materially false or fraudulent pretenses, representations, or promises.  The general scheme utilized by Defendants is described above in the conspiracy count section.   From August 2 to August 7, 2022 (four weekdays plus the weekend), Defendants submitted a claim of $10,549.78 for patient A.D., following  a modified version of the 5 Days + Weekend Formula for the CPT codes billed.  Defendants discussed this modified version of the formula—for 4 weekdays plus the weekend— via text messages.  (Pl.'s Ex. 36 at 141795-96; Pl.'s Ex. 38).  However, 1FC double billed the CPT codes for patient A.D. under the formula over the period in question.  1FC represented that it had provided patient A.D. with 116 hours of face-to-face treatment and 36 hours of case management over the six-day period (AHCCCS only approved 90 hours of face-to-face treatment and 28 hours of case management).  Further, 1FC's primary practice location was purportedly open for only 37 hours over that time.  (Pl.'s Ex. 12; Pl.'s Ex. 2).  1FC's claim for patient A.D. was a materially false statement that had the natural tendency to influence AHCCCS to part with money, as it gave AHCCCS the impression that 1FC was providing legitimate outpatient services to patient A.D.

37. Second, Defendants acted with the intent to defraud.  Defendants' intent to defraud, generally, is described above in the conspiracy count section.  Defendants demonstrated a reckless indifference to truth or falsity of their claim submission for patient A.D. by following the modified formula.   Defendants' reckless indifference is further highlighted by their double-billing error, demonstrating that they were focused on rote memorization of the billing formula, rather than billing for actual services provided.

- 41 -

38. Third, AHCCCS is a healthcare benefit program.  AHCCCS is Arizona's federally funded Medicaid agency.  The purpose of AHCCCS is to administer healthcare services to low-income residents of Arizona.

39. Fourth, the scheme in question was executed in connection with payment of $7,028.28 for the purported and approved 118 hours of healthcare services provided to patient A.D. from August 2 to August 7, 2022.  (Pl.'s Ex. 12; Pl.'s Ex. 2).

40. Defendants thus are GUILTY on Count 10 of the superseding indictment.

### D. Transactional Money Laundering (18 U.S.C. § 1957)

vi.  *Count 20:  Withdrawal of $54,000.00 to purchase cashier's check on 5/12/2021*

41. First, on May 12, 2021, Defendants knowingly engaged in a monetary transaction by withdrawing $54,000.00 from 1FC's BofA x7401, on which both Alexis Curry and Thvoughn Curry were signers, and purchasing a cashier's check of $54,000.00.  (Pl.'s Ex. 74; Pl.'s Ex. 70; Pl.'s Ex. 78).  Both the withdrawal and the cashier's check were under 1FC's name.  (Pl.'s Ex. 92).  *See* 18 U.S.C. § 1957; Ninth Circuit Manual of Model Criminal Jury Instructions § 18.7 (2022 ed., updated Sept. 2025).

42. Second, Defendants knew that the transaction involved criminally derived property. Both Thvoughn Curry and Alexis Curry were aware that AHCCCS was depositing checks in BofA x7401 and that such proceeds were derived from billings submitted to AHCCCS as a part of Defendants' conspiracy to commit healthcare fraud.  Defendants shared the account details with each other (Pl.'s Ex. 36 at 141774); discussed receiving checks in connection with their AHCCCS billing (*id.* at 141787-92); and sent the website link to view their check payments from AHCCCS every Friday (*id.* at 141794).

43. Third, the cashier's check of $54,000.00 had a value greater than $10,000.00.

44. Fourth, the funds comprising the $54,000.00 cashier's check were derived from Defendants' conspiracy to commit healthcare fraud.[12]  The transaction—on May 12,

---

[12]    For a money laundering conviction under 18 U.S.C. § 1957, the property must have, in fact, been derived from a "specified unlawful activity."  A defendant's conviction on conspiracy to commit healthcare fraud, alone, is a sufficient specified unlawful activity for a criminal money laundering violation.  Conspiracy to commit healthcare fraud, 18 U.S.C. § 1349, is considered a "Federal health care offense" and falls under the definition for a "specified unlawful activity" under the criminal money laundering statute.  *See* 18 U.S.C.

2021—took place within the conspiracy's timeline of July 2020 to December 2023. The $54,000.00 in funds were all withdrawn from BofA x7401.  From 3/2/21 to 3/25/22, that account received a total of $6,389,037.95 in inflows, of which $6,105,447.44—or 95.56%—were direct reimbursements to 1FC from AHCCCS. Thus, more than $10,000.00 of the $54,000.00 was criminally derived.

45. Fifth, the transaction occurred in the United States.  The cashier's check was purchased in Arizona.  (Pl.'s Ex. 92).

46. Defendants are thus GUILTY on Count 20 of the superseding indictment.

   vii.    _Count 22:  Withdrawal of $32,000.00 to purchase cashier's check on 10/13/2021_

47. First, on October 13, 2021, Defendants knowingly engaged in a monetary transaction by withdrawing $34,500.00 from 1FC's BofA x7401, on which both Alexis Curry and Thvoughn Curry were signers, and purchasing a cashier's check of $32,000.00.  (Pl.'s Ex. 74; Pl.'s Ex. 70; Pl.'s Ex. 78).  Both the withdrawal and the cashier's check were under 1FC's name.  (Pl.'s Ex. 93).

48. Second, Defendants knew that the transaction involved criminally derived property. Both Thvoughn Curry and Alexis Curry were aware that AHCCCS was depositing checks in BofA x7401 and that such proceeds were derived from billings submitted to AHCCCS as a part of Defendants' conspiracy to commit healthcare fraud.  Defendants shared the account details with each other (Pl.'s Ex. 36 at 141774); discussed receiving checks in connection with their AHCCCS billing (_id._ at 141787-92); and sent the website link to view their check payments from AHCCCS every Friday (_id._ at 141794).

49. Third, the cashier's check of $32,000.00 had a value greater than $10,000.00.

50. Fourth, the funds comprising the $32,000.00 cashier's check were derived from Defendants' conspiracy to commit healthcare fraud.  The transaction—on October 13, 2021—took place within the conspiracy's timeline of July 2020 to December 2023. The $32,000.00 in funds were all withdrawn from BofA x7401.  From 3/2/21 to 3/25/22, that account received a total of $6,389,037.95 in inflows, of which

§ 1957(f)(3); _id._ § 1956(c)(7)(F); _id._ § 24(a)(1).

$6,105,447.44—or 95.56%—were direct reimbursements to 1FC from AHCCCS . Thus, more than $10,000.00 of the $32,000.00 was criminally derived.

51. Fifth, the transaction occurred in the United States.  The cashier's check was purchased in Arizona.  (Pl.'s Ex. 93).

52. Defendants are thus GUILTY on Count 22 of the superseding indictment.

viii.    *Count 23:  Withdrawal of $126,542.72 to purchase cashier's check on 1/24/2022*

53. First, on January 24, 2022, Defendants knowingly engaged in a monetary transaction by withdrawing $126,542.72 from 1FC's BofA x7401, on which both Alexis Curry and Thvoughn Curry were signers,  and purchasing a cashier's check of $126,542.72.  (Pl.'s Ex. 74; Pl.'s Ex. 70; Pl.'s Ex. 78).  Both the withdrawal and the cashier's check were under 1FC's name.  (Pl.'s Ex. 94).

54. Second, Defendants knew that the transaction involved criminally derived property.  Both Thvoughn Curry and Alexis Curry were aware that AHCCCS was depositing checks in BofA x7401 and that such proceeds were derived from billings submitted to AHCCCS as a part of Defendants' conspiracy to commit healthcare fraud.  Defendants shared the account details with each other (Pl.'s Ex. 36 at 141774); discussed receiving checks in connection with their AHCCCS billing (*id.* at 141787-92); and sent the website link to view their check payments from AHCCCS every Friday (*id.* at 141794).

55. Third, the cashier's check of $126,542.72 had a value greater than $10,000.00.

56. Fourth, the funds comprising the $126,542.72 cashier's check were derived from Defendants' conspiracy to commit healthcare fraud.  The transaction—on January 24, 2022—took place within the conspiracy's timeline of July 2020 to December 2023.  The $32,000.00 in funds were all withdrawn from the BofA x7401 account.  From 3/2/21 to 3/25/22, that account received a total of $6,389,037.95 in inflows, of which $6,105,447.44—or 95.56%—were direct reimbursements to 1FC from AHCCCS.  Thus, more than $10,000.00 of the $126,542.72 was criminally derived.

57. Fifth, the transaction occurred in the United States.  The cashier's check was purchased in Arizona.  (Pl.'s Ex. 94).

58. Defendants are thus GUILTY on Count 23 of the superseding indictment.

    ix.   *Count 24: Withdrawal of $116,000.00 to purchase cashier's check on 2/5/2022*

59. First, on February 5, 2022, Defendants knowingly engaged in a monetary transaction by withdrawing $116,000.00 from 1FC's BofA x7401, on which both Alexis Curry and Thvoughn Curry were signers, and purchasing a cashier's check of $116,000.00. (Pl.'s Ex. 74; Pl.'s Ex. 70; Pl.'s Ex. 78). Both the withdrawal and the cashier's check were under 1FC's name. (Pl.'s Ex. 95).

60. Second, Defendants knew that the transaction involved criminally derived property. Both Thvoughn Curry and Alexis Curry were aware that AHCCCS was depositing checks in BofA x7401 and that such proceeds were derived from billings submitted to AHCCCS as a part of Defendants' conspiracy to commit healthcare fraud. Defendants shared the account details with each other (Pl.'s Ex. 36 at 141774); discussed receiving checks in connection with their AHCCCS billing (*id.* at 141787-92); and sent the website link to view their check payments from AHCCCS every Friday (*id.* at 141794).

61. Third, the cashier's check of $116,000.00 had a value greater than $10,000.00.

62. Fourth, the funds comprising the $116,000.00 cashier's check were derived from Defendants' conspiracy to commit healthcare fraud. The transaction—on February 5, 2022—took place within the conspiracy's timeline of July 2020 to December 2023. The $116,000.00 in funds were all withdrawn from BofA x7401. From 3/2/21 to 3/25/22, that account received a total of $6,389,037.95 in inflows, of which $6,105,447.44—or 95.56%—were direct reimbursements to 1FC from AHCCCS. Thus, more than $10,000.00 of the $116,000.00 was criminally derived.

63. Fifth, the transaction occurred in the United States. The cashier's check was purchased in Arizona. (Pl.'s Ex. 95).

64. Defendants are thus GUILTY on Count 24 of the superseding indictment.

    x.   *Count 25: Withdrawal of $10,665.10 to purchase cashier's check on 2/18/2022*

65. First, on February 18, 2022, Defendants knowingly engaged in a monetary transaction by withdrawing $10,665.10 from 1FC's BofA x7401, on which both Alexis Curry and

1    Thvoughn Curry were signers, and purchasing a cashier's check of $10,665.10.  (Pl.'s

2    Ex. 74; Pl.'s Ex. 70; Pl.'s Ex. 78).  Both the withdrawal and the cashier's check were

3    under 1FC's name.  (Pl.'s Ex. 96).

4    66. Second, Defendants knew that the transaction involved criminally derived property.

5    Both Thvoughn Curry and Alexis Curry were aware that AHCCCS was depositing

6    checks in BofA x7401 and that such proceeds were derived from billings submitted to

7    AHCCCS as a part of Defendants' conspiracy to commit healthcare fraud.  Defendants

8    shared the account details with each other (Pl.'s Ex. 36 at 141774); discussed receiving

9    checks in connection with their AHCCCS billing (*id.* at 141787-92); and sent the

10   website link to view their check payments from AHCCCS every Friday (*id.* at 141794).

11   67. Third, the cashier's check of $10,665.10 had a value greater than $10,000.00.

12   68. Fourth, the funds comprising the $10,665.10 cashier's check were derived from

13   Defendants' conspiracy to commit healthcare fraud.  The transaction—on February 18,

14   2022—took place within the conspiracy's timeline of July 2020 to December 2023.

15   The $10,665.10 in funds were all withdrawn from BofA x7401.  From 3/2/21 to

16   3/25/22, that account received a total of $6,389,037.95 in inflows, of which

17   $6,105,447.44—or 95.56%—were direct reimbursements to 1FC from AHCCCS.

18   Thus, more than $10,000.00 of the $10,665.10 was criminally derived.

19   69. Fifth, the transaction occurred in the United States.  The cashier's check was purchased

20   in Arizona.  (Pl.'s Ex. 96).

21   70. Defendants are thus GUILTY on Count 25 of the superseding indictment.

22       xi.   *Count 26:  Withdrawal of $298,243.92 to purchase cashier's check on 3/16/2022*

23   71. First, on March 16, 2022, Defendants knowingly engaged in a monetary transaction by

24   withdrawing $298,243.92 from 1FC's BofA x7401, on which both Alexis Curry and

25   Thvoughn Curry were signers, and purchasing a cashier's check of $298,243.92.  (Pl.'s

26   Ex. 74; Pl.'s Ex. 70; Pl.'s Ex. 78).  Both the withdrawal and the cashier's check were

27   under 1FC's name.  (Pl.'s Ex. 97).

28   72. Second, Defendants knew that the transaction involved criminally derived property.

Both Thvoughn Curry and Alexis Curry were aware that AHCCCS was depositing checks in BofA x7401 and that such proceeds were derived from billings submitted to AHCCCS as a part of Defendants' conspiracy to commit healthcare fraud. Defendants shared the account details with each other (Pl.'s Ex. 36 at 141774); discussed receiving checks in connection with their AHCCCS billing (*id.* at 141787-92); and sent the website link to view their check payments from AHCCCS every Friday (*id.* at 141794).

73. Third, the cashier's check of $298,243.92 had a value greater than $10,000.00.

74. Fourth, the funds comprising the $298,243.92 cashier's check were derived from Defendants' conspiracy to commit healthcare fraud. The transaction—on March 16, 2022—took place within the conspiracy's timeline of July 2020 to December 2023. The $298,243.92 in funds were all withdrawn from BofA x7401. From 3/2/21 to 3/25/22, that account received a total of $6,389,037.95 in inflows, of which $6,105,447.44—or 95.56%—were direct reimbursements to 1FC from AHCCCS. Thus, more than $10,000.00 of the $298,243.92 was criminally derived.

75. Fifth, the transaction occurred in the United States. The cashier's check was purchased in Arizona. (Pl.'s Ex. 97).

76. Defendants are thus GUILTY on Count 26 of the superseding indictment.

   xii.    *Count 16:  Withdrawal of $91,923.29 to purchase cashier's check on 3/21/2022*

77. First, on March 21, 2022, Defendants knowingly engaged in a monetary transaction by withdrawing $91,923.29 from 1FC's BofA x7401, on which both Alexis Curry and Thvoughn Curry were signers,  and purchasing a cashier's check of $91,923.29. (Pl.'s Ex. 74; Pl.'s Ex. 70; Pl.'s Ex. 78).  Both the withdrawal and the cashier's check were under 1FC's name.  (Pl.'s Ex. 98).

78. Second, Defendants knew that the transaction involved criminally derived property. Both Thvoughn Curry and Alexis Curry were aware that AHCCCS was depositing checks in BofA x7401 and that such proceeds were derived from billings submitted to AHCCCS as a part of Defendants' conspiracy to commit healthcare fraud. Defendants shared the account details with each other (Pl.'s Ex. 36 at 141774); discussed receiving

checks in connection with their AHCCCS billing (*id.* at 141787-92); and sent the website link to view their check payments from AHCCCS every Friday (*id.* at 141794).

79. Third, the cashier's check of $91,923.29 had a value greater than $10,000.00.

80. Fourth, the funds comprising the $91,923.29 cashier's check were derived from Defendants' conspiracy to commit healthcare fraud.  The transaction—on March 21, 2022—took place within the conspiracy's timeline of July 2020 to December 2023.  The $91,923.29 in funds were all withdrawn from BofA x7401.  From 3/2/21 to 3/25/22, that account received a total of $6,389,037.95 in inflows, of which $6,105,447.44—or 95.56%—were direct reimbursements to 1FC from AHCCCS.  Thus, more than $10,000.00 of the $91,923.29 was criminally derived.

81. Fifth, the transaction occurred in the United States.  The cashier's check was purchased in Arizona.  (Pl.'s Ex. 98).

82. Defendants are thus GUILTY on Count 16 of the superseding indictment.

xiii.    *Count 17:  Withdrawal of $303,912.60 to purchase cashier's check on 3/25/2022*

83. First, on March 25, 2022, Defendants knowingly engaged in a monetary transaction by withdrawing $314,094.12 from 1FC's BofA x7401, on which both Alexis Curry and Thvoughn Curry were signers,  and purchasing a cashier's check of $303,912.60.  (Pl.'s Ex. 74; Pl.'s Ex. 70; Pl.'s Ex. 78).  Both the withdrawal and the cashier's check were under 1FC's name.  (Pl.'s Ex. 99).

84. Second, Defendants knew that the transaction involved criminally derived property.  Both Thvoughn Curry and Alexis Curry were aware that AHCCCS was depositing checks in BofA x7401 and that such proceeds were derived from billings submitted to AHCCCS as a part of Defendants' conspiracy to commit healthcare fraud.  Defendants shared the account details with each other (Pl.'s Ex. 36 at 141774); discussed receiving checks in connection with their AHCCCS billing (*id.* at 141787-92); and sent the website link to view their check payments from AHCCCS every Friday (*id.* at 141794).

85. Third, the cashier's check of $303,912.60 had a value greater than $10,000.00.

86. Fourth, the funds comprising the $303,912.60 cashier's check were derived from

Defendants' conspiracy to commit healthcare fraud. The transaction—on March 25, 2022—took place within the conspiracy's timeline of July 2020 to December 2023. The $303,912.60 in funds were all withdrawn from BofA x7401. From 3/2/21 to 3/25/22, that account received a total of $6,389,037.95 in inflows, of which $6,105,447.44—or 95.56%—were direct reimbursements to 1FC from AHCCCS. Thus, more than $10,000.00 of the $303,912.60 was criminally derived.

87. Fifth, the transaction occurred in the United States. The cashier's check was purchased in Arizona. (Pl.'s Ex. 99).

88. Defendants are thus GUILTY on Count 17 of the superseding indictment.

**E. Co-Schemer and Aiding-and-Abetting Liability**

89. For each of the healthcare fraud counts (6, 8, 10) and money laundering counts (16-17, 20, 22-26), Defendants are liable as either principals, co-schemers, or as aiders and abettors.

90. The Government has proven beyond a reasonable doubt that each of the healthcare fraud offenses were those that Defendants could have reasonably foreseen as necessary and natural consequences of their scheme to commit healthcare fraud. Ninth Circuit Model Criminal Jury Instruction § 15.33 (2022 ed.); *United States v. Martinez*, 921 F.3d 452, 472 (5th Cir. 2019) (acknowledging co-schemer liability for healthcare fraud); *United States v. Merino*, 846 F. App'x 494, 496 (9th Cir. 2021) (unpublished) (same) (citing *Pinkerton v. United States*, 328 U.S. 640 (1946)).

91. The Government has also proven beyond a reasonable doubt that Defendants aided and abetted each other during the commission of each of the healthcare fraud offenses and money laundering offenses. Both Defendants took affirmative acts in furtherance of each offense—such as setting up bank accounts, submitting the AHCCCS application, withdrawing funds to purchase the cashier's checks, and billing claims on the AHCCCS website—with the intent of facilitating the offense's commission. *Rosemond v. United States*, 572 U.S. 65, 71-73 (2014); 18 U.S.C. § 2.

1

## CONCLUSION

2         For the reasons stated above, the Court finds that Defendant Alexis Daneen Curry

3    and Defendant Thvoughn Lynden Curry are guilty of the following counts alleged in the

4    superseding indictment:

| Count | Charge | Defendant | Verdict |
|---|---|---|---|
| 1 | Conspiracy (18 U.S.C. § 1349) | Alexis Curry | GUILTY |
| | | Thvoughn Curry | GUILTY |
| 2 | Wire Fraud (18 U.S.C. §§ 1343, 2) | Alexis Curry | NOT GUILTY |
| | | Thvoughn Curry | NOT GUILTY |
| 6 | Health Care Fraud (18 U.S.C. §§ 1347, 2) | Alexis Curry | GUILTY |
| | | Thvoughn Curry | GUILTY |
| 8 | Health Care Fraud (18 U.S.C. §§ 1347, 2) | Alexis Curry | GUILTY |
| | | Thvoughn Curry | GUILTY |
| 10 | Health Care Fraud (18 U.S.C. §§ 1347, 2) | Alexis Curry | GUILTY |
| | | Thvoughn Curry | GUILTY |
| 16 | Money Laundering (18 U.S.C. §§ 1957, 2) | Alexis Curry | GUILTY |
| | | Thvoughn Curry | GUILTY |
| 17 | Money Laundering (18 U.S.C. §§ 1957, 2) | Alexis Curry | GUILTY |
| | | Thvoughn Curry | GUILTY |
| 20 | Money Laundering (18 U.S.C. §§ 1957, 2) | Alexis Curry | GUILTY |
| | | Thvoughn Curry | GUILTY |
| 22 | Money Laundering (18 U.S.C. §§ 1957, 2) | Alexis Curry | GUILTY |
| | | Thvoughn Curry | GUILTY |
| 23 | Money Laundering (18 U.S.C. §§ 1957, 2) | Alexis Curry | GUILTY |
| | | Thvoughn Curry | GUILTY |
| 24 | Money Laundering (18 U.S.C. §§ 1957, 2) | Alexis Curry | GUILTY |
| | | Thvoughn Curry | GUILTY |
| 25 | Money Laundering (18 U.S.C. §§ 1957, 2) | Alexis Curry | GUILTY |
| | | Thvoughn Curry | GUILTY |
| 26 | Money Laundering (18 U.S.C. §§ 1957, 2) | Alexis Curry | GUILTY |
| | | Thvoughn Curry | GUILTY |

Dated this 20th day of February, 2026.

G. Murray Snow
Senior United States District Judge